UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SOUAD AWAD,                          :
                                     :CIVIL ACTION NO. 3:14-CV-1054
          Plaintiff,                 :
                                     :(JUDGE CONABOY)
          v.                         :
                                     :
CAROLYN COLVIN,                      :
Acting Commissioner of               :
Social Security,                     :
                                     :
          Defendant.                 :
                                     :
_____

### MEMORANDUM

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").  (Doc. 1.)  Plaintiff claims disability beginning on November 16, 2011 (R. 17), her Disability Report listing cervical/lumbar spine pain as the condition that limits her ability to work (R. 153).  The Administrative Law Judge ("ALJ") who evaluated the claim, Richard Zack, concluded in his October 23, 2012, decision that Plaintiff had the severe impairments of degenerative disc disease of her cervical spine and degenerative disc disease of the lumbar spine.  (R. 19.)  He determined that Plaintiff's severe impairments did not meet or equal the listings.  (R. 20.)  The ALJ also found that Plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work with exertional and  nonexertional limitations.  (R. 21.)  After finding that Plaintiff was not capable of performing past relevant work, the ALJ determined that there are jobs that

exist in significant numbers in the national economy that Plaintiff can perform, and, therefore, had not been under a disability from November 1, 2007, through the date of the decision.  (R. 24-26.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for several reasons. Plaintiff asserts the AlJ erred because his RFC assessment is not supported by substantial evidence (Doc. 15 at 7), he did not properly consider Plaintiff's use of a cane (*id.* at 16), and the Acting Commissioner did not sustain her burden of establishing that there is other work in the national economy Plaintiff could perform (*id.* at 18).  For the reasons discussed below, we conclude Plaintiff's appeal of the Acting Commissioner's decision is properly granted.

## I. Background

### A. Procedural Background

Plaintiff protectively filed a Title II application for DIB on August 5, 2011, alleging disability beginning November 1, 2007. (R. 12.)  This claim was denied initially on November 16, 2011.  (*Id.*) Plaintiff filed a written request for a hearing on December 27, 2011, and a hearing was held before ALJ Richard Zack on October 15, 2012.  (*Id.*)  Plaintiff was represented by counsel at the ALJ hearing and a Vocational Expert also testified.  (*Id.*)  Plaintiff testified with the assistance of a Moroccan Arabic interpreter. (*Id.*)  In his October 23, 2012, decision, the ALJ concluded that

Plaintiff was not under a disability within the meaning of the Social Security Act from November 1, 2007, through the date of the decision. (R. 26.) As noted above, this determination was made at step five where the ALJ concluded Plaintiff had the residual functional capacity to perform jobs which exist in sufficient numbers in the national economy. (R. 25.)

On December 11, 2012, Plaintiff requested review of the ALJ's hearing decision. (R. 13.) The Appeals Council denied her request for review on February 27, 2014. (R. 5-9.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 5.)

On May 31, 2014, Plaintiff filed the above-captioned matter in this Court. (Doc. 1.) Defendant filed her Answer and the required transcript on July 30, 2014. (Docs. 7, 8.) Because Plaintiff did not timely file her supporting brief, the Court dismissed the case on October 6, 2014. (Doc. 9.) After Plaintiff moved to reinstate the action, the Court reopened the case on January 28, 2015. (Docs. 12, 14.) Plaintiff filed her supporting brief (Doc. 15) on February 2, 2015, and Defendant filed her responsive brief (Doc. 12) on April 6, 2015. With the filing of Plaintiff's reply brief (Doc. 19) on April 13, 2015, this case became ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on April 27, 1968, and was thirty-nine years old on the alleged disability onset date. (R. 24.) She did not engage in substantial gainful activity since the onset date.

3

(R. 19.)  Plaintiff has a limited education and is able to communicate in English in only a rudimentary fashion.  (R. 24.) Plaintiff last worked as a packer in a factory.  (R. 154.)

**1.**   **Summary of Medical Evidence**

Having received workers' compensation for a back injury (R. 60), Plaintiff continued to treat for lower back pain (R. 203).  A November 30, 2007, NEPA Imaging Center report concerning lumbar spine MRI, records the following impression: "Disc bulges at L3-4, L4-5, and L5-S1, the largest at L4-5 and L5-S1 with annular tears as above with mild canal narrowing at L4-5 and L5-S1 and mild neural foraminal narrowing as above."  (R. 203.)

On August 15, 2008, Alex D. Perez, M.D., stated that Plaintiff had a history of chronic low back pain secondary to occupational injury.  (R. 201.)  He further stated that Plaintiff had a lumbar epidural steroid block that provided relief for two days but returned with intensity of seven out of ten, worsened by activity. (*Id.*)  He reported that an August 12, 2008, MRI of the lumbar spine showed "multilevel degenerative changes and broad-based L5/S1 disc protrusion that appears improved Miami-based Balbina L3/4 and L4/5 and T10/11, facet hypertrophy at T10/11."  (Id.)  Dr. Perez noted that Plaintiff received some relief from her medications, "meloxicam 15 mg. daily as needed and Flexeril 10 mg. nightly prn." (*Id.*)  His impression was "[c]hronic low back pain, predominantly secondary to facet arthropathy, and he planned to continue her

4

medications and schedule a right-sided lumbar facet joint block. (*Id.*)

On October 6, 2008, Plaintiff was seen at CHS Professional Practice, Department of Physical Medicine and Rehabilitation, with chief complaints of neck and arm pain.  (R. 208.)  Certified Physician Assistant Jena Diviney saw and examined Plaintiff "incident to" Steven Mazza, M.D.  (R. 209.)  PA Diviney noted that Plaintiff was not working due to "a workman's comp injury of the lower back."  (R. 208.)  Plaintiff had discomfort in side-to-side rotation as well as extension, and her shoulder examination showed painful range of motion in all planes, positive impingement sign, and positive cross-over induction test.  (R. 209.)  Plaintiff was set up for a nerve conduction study to help determine whether the pain generator was the bulging disc in the neck or the left shoulder.  (*Id.*)  She was also scheduled for a shoulder MRI and started on a course of prednisone.  (*Id.*)

The October 10, 2008, nerve conduction study showed abnormal results; mild right C2 hypofunction and radiculitis; hyperfunction of right T1 suggesting probable irritation; and hyperfunction of left T2 suggesting probable irritation.  (R. 210.)  On the same date, Plaintiff had a left shoulder MRI.  (R. 214.)  Eiran Mandelker, M.D., recorded the following impression: "1. Minimal supraspinatus tendinopathy.  A Type II minimally low lying laterally downsloping acromion is present.  Minimal

acromiocluviculur degenerative changes are present.  2. Small shoulder effusion."  (R. 215.)

Plaintiff saw Dr. Mazza on October 17, 2008.  (R. 216.) Plaintiff did not have a significantly positive shoulder exam at the time.  (*Id.*)  As a result of the recent testing, Dr. Mazza concluded the likely source of the shoulder pain was the left-sided disc herniation at C5-6.  (Id.)  His plan was for Plaintiff to have C7-T1 interlaminar cervical epidural steroid injections and for her to continue antiinflammatory medication.  (*Id.*)  Plaintiff had the injections on November 11, 2008.  (R. 217.)

Dr. Mazza's office notes of December 10, 2008, indicate that the physician who had previously seen Plaintiff for her work-related lumbar injury felt that Plaintiff had exhausted conservative care and recommended an L5-S1 diskectomy.  (R. 219.) Plaintiff did not follow through because of fear of surgery.  (*Id.*) Dr. Mazza assessed Plaintiff to have low back pain, left lower extremity radiculopathy, L5-S1 disk protrusion, and facet arthropathy.  (R. 220.)  He did not believe Plaintiff had exhausted conservative care.  (*Id.*)  Dr. Mazza also noted that he would "keep her at sedentary capacity as she has been released by Dr. Naftulin previously."  (*Id.*)  Her pain level at the time was recorded at nine out of ten.  (R. 221.)

Later that month, on December 22, 2008, Plaintiff was scheduled for epidural steroid injections because of radiating

symptoms with an L5-S1 disc herniation.  (R. 222.)  She was to continue on sedentary duty.  (*Id.*)

On January 9, 2009, Dr. Mazza recommended left L3-4-5 medial branch blocks.  (R. 226.)  Though at first Plaintiff refused more injections or surgery, she considered changing her mind.  (*Id.*) She was to continue work restrictions.  (*Id.*)

On March 30, 2009, Plaintiff again saw Dr. Mazza with complaints of cervical pain and bilateral shoulder pain.  (R. 281.) He assessed Plaintiff to have cervical pain and degenerative disc disease, cervical radiculitis, bilateral shoulder pain, and bilateral rotator cuff tendinopathy.  (R. 281.)  He recommended icing the area several times daily for fifteen to twenty minutes and continuing on antiinflammatory medications.  (*Id.*)

In September 2010, Plaintiff saw Dr. Mazza for back and neck pain, and pain down her arm.  (R. 265-66.)  She was using Lidoderm patches, and Norflex, Tramadol and Nucynta for pain relief.  (R. 266.)  Dr. Mazza recorder Plaintiff's gait to be normal, decreased rotation, decreased flexion and extension during cervical range motion, her motor strength was 5/5 in all muscle groups, and Spurling's test was positive on the left.  (*Id.*)  Acknowledging that physical therapy had limited success in the past, Dr. Mazza again recommended it.  (*Id.*)  He also reported that he again told Plaintiff she was a surgical candidate but Plaintiff continued to refuse surgery.  (*Id.*)

At Plaintiff's next visit with Dr. Mazza on September 26, 2011, Plaintiff reported right knee pain in addition to her back and neck pain.  (R. 262-63.)  She retained range of motion of the right knee with slight effusion and tenderness to palpation noted. (R. 263.)  Dr. Mazza reiterated that he felt surgery was her only option regarding her neck and lower back pain and recorded that she did not have insurance coverage so the medication routine would be continued.  (*Id.*)  She was to follow up in six to twelve months or sooner if she got insurance coverage and wanted to have surgery. (R. 264.)

In November 2011, Plaintiff was referred by Matt Vergari, M.D., for an EMG (electromyography) of both upper extremities and cervical paraspinal muscles.  (R. 399.)  The report indicates the ENMG (electroneuromyography) of the bilateral upper extremity was abnormal and most consistent with the following: "[l]eft C6 root irritation of acute nature[;] [b]ilateral median motor and sensory peripheral neuropathy of primarily demyleninating in natrue across both wrists, consistent with bilateral Carpal tunnel syndrome[; and] [b]ilateral ulnar motor and sensory peripheral neuropathy primarily demyelinating in nature across both wrists, consistent with bilateral Guyon's tunnel syndrome."  (R. 399.)

In November 2011 Plaintiff was also referred for an EMG of both lower extremities which was abnormal as to the left lower extremity consistent with left L5 root irritation acute in nature.

8

(R. 396.)  Plaintiff also had an MRI of the lumbar spine which showed the following: straightening of normal lordosis compatible with spasm; L4-L5 mild broad-based disc bulge as well as mild bilateral facet hypertrophy and mild stenosis of the lateral recess and neural foramina, more left that right; L5-S1 broad-based disc bulge and a central protrusion with an annular tear measuring 4 mm abutting the nerve roots in the ventral central canal; and no significant canal or foraminal stenosis.  (R. 391.)

Plaintiff saw Dr. Vergari on December 5, 2011, for a follow-up visit.  (R. 381.)  Dr. Vergari recorded that Plaintiff continued to have neck and back pain, the neck pain radiating to left arm and should with left hand paresthesias.  (*Id.*)  He noted that Plaintiff continued to complain of a stiff neck and at times she was unable to move her left hand.  (*Id.*)  She also complained of low back pain that radiates down both legs with paresthesias, and bilateral knee pain with difficulty walking up and down stairs.  (*Id.*)  Following examination, Dr. Vergari assessed the following: tear of the medial cartilage or meniscus of the right knee; displacement of lumbar intervertebral disc without myelopathy; carpal tunnel syndrome; unspecified disorders of bursae and tendons in shoulder region; intervertebral cervical disc disorder with myelopathy, cervical region; and intervertebral thoracic disc disorder with myelopathy, thoracic region.  (R. 383.)  The treatment plan consisted of further diagnostic studies, physical therapy, medications, and

9

wrist splints at night and with repetitive motion.  (*Id.*)

A December 9, 2011, MRI of the right knee showed the following: small joint effusion; oblique tear posterior horn of the medial meniscus extending to the inferior articular surface and the body; Grade 1 sprain anterior cruciate ligament; and mild peritendinosis of the popliteus tendon.  (R. 394.)

Dr. Vergari again saw Plaintiff on January 24, 2012, for complaints of knee pain, shoulder pain, neck pain and back pain. (R. 378.)  Upon examination, Dr. Vergari recorded the following: motor strength 5/5 in upper and lower extremity except left anterior tibialis weakness at 4+; reflexes Tinel's and Phalen's test positive (Carpal Tunnel); left shoulder tenderness, abduction limited to 75 degrees, negative Hawkins test and negative Neer impingement sign; cervical spine muscle spasm, limitation of neck movement to both horizontal planes, cervical and trapezius muscle spasm, left lateral rotation of 30 degrees, and right lateral rotation 15 degrees; left knee showed moderate effusion, diffuse soft tissue swelling and prepatellar swelling, medial and lateral joint line tenderness, mild crepitus with motion, and all ligaments appeared stable; right knee showed large effusion, diffuse soft tissue swelling and prepatellar swelling, medial and lateral joint line tenderness, mild crepitus with motion, and all ligaments appeared stable; the thoracic spine showed muscle spasm and tenderness; the lumbar spine showed lumbosacral paraspinal muscle

spasm and single leg raise bilaterally positive at 30 degrees.  Dr. Vergari's assessment was similar to that of December 5, 2011, and his plan included steroid injections of the left shoulder and right knee, as well as continuing on prescribed medications.  (R. 379-80.)

Plaintiff had the right knee injection on February 1, 2012, which resulted in her pain being reduced from ten out of ten to six out of ten.  (R. 376.)  Plaintiff had the left shoulder injection on March 14, 2012, which resulted in her pain being reduced from eight out of ten to four out of ten.  (R. 374.)

At her March 27, 2012, visit with Dr. Vergari, Plaintiff again reported neck, back, knee and shoulder pain.  (R. 371.)  Plaintiff reported that the injections helped her knee and shoulder pain but she still had left knee pain and difficulty walking up and down stairs as well as neck and back pain that radiates into her upper and lower extremities bilaterally with parasthesias, and difficulty sleeping at night due to pain.  (*Id.*)  To his previous assessments, Dr. Vergari added "unspecified internal derangement of knee" for which he planned further testing.  (R. 372.)  Diagnostic testing of the left knee showed mild degeneration of the medial and lateral meniscal without tearing, heterogeneous marrow signal of the distal femur likely related to marrow activity, and a small amount of joint fluid and small popliteal cyst.  (R. 395.)

Plaintiff reported that her symptoms continued at her May 25,

2012, and September 4, 2012, office visits. (R. 365, 368.) Examinations and assessments were also similar to earlier visits except at the September 4th visit, her left knee showed severe crepitus with motion and limitation of flexion and extension to 75 degrees. (R. 365-66, 368-69.) Plaintiff had a steroid injection of the left knee on September 17, 2012, which resulted in pain reduction from ten out of ten to six out of ten. (R. 361.)

**2. <u>Medical Opinion Evidence</u>**

On August 19, 2008, an Evaluation of Physical Abilities signed by a physician, evaluated Plaintiff's ability to engage in certain activities by strength level and frequency and duration.[1] (R. 206.) By strength level, all lifting abilities were restricted to sedentary (one to ten pounds). (*Id.*) Carrying, pushing, and pulling were restricted to light (eleven to twenty pounds). (*Id.*) The frequency and duration category indicates the following: Plaintiff could never reach overhead, stoop, squat, crouch, or balance; she could occasionally (1/3 of the time) reach to the front, kneel, climb stairs, and engage in repetitive foot movement; and she could frequently (1/3 to 2/3 of the time) walk, stand, sit, handling right and left, and fingering right and left. (*Id.*) It was also noted that Plaintiff had not achieved maximum medical improvement. (*Id.*)

On October 17, 2011, Dr. Mazza completed an Estimated

[1] The signature on the form is not legible. (R. 206.)

Functional Capacity Evaluation.  (R. 352-53.)  Dr. Mazza reported the following limitations: Plaintiff could continuously lift and carry up to ten pounds, occasionally up to twenty-four pounds, and never above that; she could frequently push/pull while seated and occasionally while standing; she could bend, squat, crawl and reach above shoulder level occasionally; she could never climb; with rests Plaintiff could sit for six hours, stand and walk for two hours, and alternate sitting and standing for four hours; Plaintiff could use her hands repetitively for simple and firm grasping and fine manipulating; she could use her feet for repetitive movements; Plaintiff had total restriction from unprotected heights, moderate restriction from being around moving machinery, and no restrictions regarding exposure to marked changes in temperature and humidity and exposure to dust, fumes and gases.  (R. 352-53.)  Dr. Mazza did not opine whether Plaintiff could return to her former job as the job was unknown to him.  (R. 353.)  However, he noted that Plaintiff could return to work on a part-time basis according to the previously identified restrictions.  (*Id.*)

In the Disability Determination Explanation dated November 16, 2011, David Hutz, M.D., reviewed the evidence, including the October 17, 2011, evaluation.[2]  (R. 82-90.)  He concluded that Plaintiff had the medically determinable impairment of DDD

---

[2]    Dr. Hutz attributes the evaluation to "Steve Maoran."  (R. 86.)

("Disorders of the Back-Discogenic and Degenerative") at the severe level.  (R. 85.)   Regarding credibility, Dr. Hutz determined that Plaintiff was partially credible: he found that Plaintiff's impairment could reasonably be expected to produce her symptoms but her statements about the intensity, persistence, or functionally limiting effects of the symptoms were not substantiated by the objective medical evidence based on her activities of daily living and her medication and treatment.  (R. 86.)  Dr. Hutz also concluded that Dr. Mazza's medical opinion was an overestimate of Plaintiff's physical limitations based on the evidence in the file. (R. 86.)  Dr. Hutz determined that Plaintiff could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally but she could never climb ladders, ropes, or scaffolds.  (R. 87.)  He found she had no manipulative, visual, or communicative limitations but she had environmental limitations concerning extreme cold, wetness, and hazards such as machinery and heights.  (R. 87-88.) He ultimately concluded Plaintiff was not disabled: she had the capability of performing light work and appropriate jobs were available in the national economy.  (R. 89-90.)

On October 5, 2012, Dr. Vergari completed a Physical Residual Functional Capacity Questionnaire.  (R. 407-12.)  Dr. Vergari had been treating Plaintiff since November 11, 2011.  (R. 407.)  He

14

diagnosed her with the following:[3] 1) 836.0--tear of the medial
cartilage or meniscus of knee, current; 2) 726.10--disorder of the
bursae and tendons in shoulder region unspecified; 3) 722.71--
intervertebral disc disorder with myelopathy, cervical region; 4)
722.72--intervertebral disc disorder with myelopathy, thoracic
region; 5) 722.10--displacement of lumbar intervertebral disc
without myelopathy; 6) 717.9--unspecified internal derangement of
knee; and 7) 354.0--carpal tunnel syndrome. (*Id.*)   He identified
her prognosis as guarded and listed her symptoms as neck pain, back
pain, shoulder pain and knee pain, all severe, persistent and
chronic in nature. (*Id.*)   Clinical findings and objective signs
were recorded as "moderate spasm, limitation of movement, multi-
level facet tenderness, joint tenderness, effusion, weakness."
(*Id.*)   Dr. Vergari noted that Plaintiff had been treated with
pharmacotherapy, physical therapy, and injection therapy--all with
minimal improvement. (*Id.*)   He opined that the impairments lasted
or could be expected to last at least twelve months, Plaintiff was
not a malingerer, and her symptoms were affected by anxiety. (R.
407-08.)   Dr. Vergari concluded that Plaintiff's symptoms were
constantly severe enough to interfere with the attention and
concentration necessary to perform even simple work and she was
incapable of even low stress jobs because of severe pain, spasm,

---

[3]   Dr. Vergari identified diagnoses by number. (R. 407.)   We
include the diagnosis description. *See*
http://www.icd9data.com/2014/Volume 1.

and limitation of movement.  (R. 408-09.)  He specifically found that Plaintiff could walk less than one block without resting or severe pain, could sit for fifteen minutes at a time, and stand for ten minutes at a time.  (R. 409.)  She could sit, stand/walk for less that two hours in an eight-hour workday and would need periods of walking around approximately every fifteen minutes for five minutes at a time.  (R. 409-10.)  She needs a job where she could shift positions and take unscheduled breaks for about fifteen minutes at a time.  (R. 410.)  Dr. Vergari noted that Plaintiff would have to use a cane or other assistive device when engaging in occasional standing/walking.  (*Id.*)  He opined that she could never lift or carry, look up or down, twist, stoop, crouch, or climb ladders; she could rarely turn her head to the left or right and climb stairs and she could occasionally hold her head in a static position; Plaintiff has significant limitations with reaching, handling or fingering, with less than 10% ability to grasp, turn or twist objects with her hands, finely manipulate with her fingers, and reach with her arms.  (R. 410-11.)  Dr. Vergari  concluded that Plaintiff's impairments would produce good days and bad days, resulting in her being absent from work more than four days per month.  (R. 411.)  Finally, he opined that she was temporarily disabled and unable to work full-time at any level of exertion. (R. 412.)

16

3.   **ALJ Decision**

By decision of October 23, 2012, ALJ Zack determined that
Plaintiff was not disabled as defined in the Social Security Act.
(R. 26.)  He made the following findings of fact and conclusions of
law:

1.   The claimant meets the insured status
requirements of the Social Security Act
through December 31, 2014.

2.   The claimant has not engaged in
substantial gainful activity since
November 1, 2007, the alleged onset date
(20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe
impairments: degenerative disc disease
of the cervical spine and degenerative
disc disease of the lumbar spine (20 CFR
404.1520(c)).

4.   The claimant does not have an impairment
or combination of impairments that meets
or medically equals the severity of one
of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR
404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the
entire record, the undersigned finds
that the claimant has the residual
functional capacity to perform a range
of sedentary work as defined in 20 CFR
404.1567(a).  She could lift up to 10
pounds occasionally, 2 or 3 pounds
frequently.  The claimant, given normal
breaks and lunch periods, cumulatively,
over the course of a given workday,
could sit for at least 6 out of 8 hours.
She could be on her feet, either
standing or walking, for about 2 out of
8 hours cumulatively.  To sustain a full

17

8-hour workday or the equivalent thereof, the claimant could only walk short distances, such as around immediate workstation or no more than a city block. When she is on her feet standing, it would be for short periods at a time, with standing activities not exceeding 10-15 minutes at a time. The claimant has restrictions in using her arms for work above shoulder or head level. She maintains full use of her hands for grasping and manipulation. The claimant should avoid any job that requires her to climb, including ladders and scaffolds. She should also avoid any job that exposes her to hazards, such as unprotected, dangerous machinery and unprotected heights. The claimant should not be exposed to constant vibration as part of her job duties. From a nonexertional standpoint, the claimant should not be placed in any work environment where she is exposed to extremes of temperature or humidity, or heavy concentrations of dusts, fumes, odors, or gases.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on April 27, 1968 and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has a limited education and is able to communicate in English in only a limited rudimentary fashion (20 CFR 404.1564).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.  Considering the claimant's age, education, work experience, and residual

> functional capacity, there are jobs that
> exist in significant numbers in the
> national economy that the claimant can
> perform (20 CFR 404.1569 and
> 404.1569(a)).
>
> 11. The claimant has not been under a
> disability, as defined in the Social
> Security Act from November 1, 2007,
> through the date of this decision (20
> CFR 404.1520(g)).

(R. 19-26.)

The ALJ considered Plaintiff's back and neck problems, concluding the medically determinable impairments of degenerative disc disease of the cervical and lumbar spine could reasonably be expected to cause the alleged symptoms but Plaintiff's statements about the intensity, persistence and limiting effects of the symptoms "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 22.) The ALJ noted that the record did not support Plaintiff's alleged level of incapacity. (*Id.*)

Citing exhibits containing medical records from November 2007 through September 2012, the ALJ does not cite to specific documents in support of his conclusions, including that "[o]bjective signs and finding on physical examination are not particularly adverse," and "the claimant maintains good use of her hands." (R. 22 (citing Exhibits 2F, 3F, 6F, and 7F).)

Regarding opinion evidence, the ALJ gave some weight to Dr. Hutz's opinion but found Plaintiff limited to sedentary work with

some limitations rather than the light work Dr. Hutz had concluded appropriate.  (R. 23.)  ALJ Zack states that he gave "appropriate weight" to Dr. Mazza's opinion––agreeing that Plaintiff would be capable of performing a range of sedentary work with limitations but disagreeing with Dr. Mazza's opinion that Plaintiff is only capable of part-time work.  (R. 24.)  Rejecting the opinions of Dr. Vergari presented in the Residual Functional Capacity Questionnaire, without citation to the record the ALJ supports his conclusion on the basis that "it is inconsistent with the other evidence of record, including findings upon examination and diagnostic testing."  (R. 24.)  ALJ Zack also notes that Dr. Vergari's opinion that Plaintiff is disabled is an issue reserved to the Commissioner purusant to SSR 96-5p.  (*Id.*)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[4]  It is necessary for the

---

[4]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such

20

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner

---

work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found that Plaintiff was capable of performing sedentary work that existed in sufficient numbers in the national economy.  (R. 25.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence--

> particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See, e.g., Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement

that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d

24

112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

<div align="center">

### IV. Discussion

</div>

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's

disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B.  *Plaintiff's Alleged Errors***

Plaintiff first asserts the decision of the Social Security Administration is error because his RFC assessment is not supported by substantial evidence for the following reasons: 1) the ALJ failed to discuss and consider several of Plaintiff's impairments (Doc. 15 at 7); 2) the ALJ failed to give adequate weight to the opinion of Plaintiff's treating physician (*id.* at 8); 3) the ALJ failed to properly consider 20 C.F.R. § 404.1527(d) in evaluating the opinion of the treating physician (*id.* at 12); 4) the ALJ erred in failing to contact Plaintiff's treating physician (*id.* at 13); and 5) the ALJ failed to include the required "function-by-function" assessment (*id.* at 14).  Plaintiff also contends the ALJ did not properly consider Plaintiff's use of a cane: 1) he did not consider the impact of the need for an assistive device on Plaintiff's ability to perform sedentary work; and 2) he did not pose a hypothetical question which included the use of a cane. (*Id.* at 16-17.)  Finally, Plaintiff maintains the Acting Commissioner did not sustain her burden of establishing that there is other work in the national economy Plaintiff could perform (*id.* at 18).

**1.  <u>Consideration of All Impairments</u>**

In support of her argument that the RFC assessment is not

supported by substantial evidence, Plaintiff asserts that the ALJ ignored several impairments diagnosed by Dr. Vergari including a tear of the medial cartilage or meniscus of the knee, derangement of the knee, carpal tunnel, bilateral shoulder pain, and rotator cuff tendinopathy.  (Doc. 15 at 7 (citing R. 281, 379, 399).) Defendant responds that the ALJ properly considered all of Plaintiff's relevant impairments.  (Doc. 18 at 13.)  After careful consideration of the record, we conclude that the ALJ erred on this basis and his error is cause for remand.

The record shows that Plaintiff complained of shoulder pain at her visit with Dr. Mazza on October 6, 2008, and examination showed "painful ROM in all planes[,] . . . positive impingement sign as well as cross-over abduction test[, and] . . . positive empty the can test."  (R. 209.)  Dr. Mazza noted that Plaintiff's strength seemed to be intact although it was difficult to assess because of pain.  (*Id.*)  He planned to do a nerve conduction study to determine whether the pain was from the bulging disc in her neck or originating in the left shoulder.  (*Id.*)  Following the nerve conduction study (R. 210) and MRI of the shoulder (R. 214), Dr. Mazza concluded that the cervical region was the likely origin of the pain--"specifically on the left sided disc herniation at C5-6 which seems to be essentially consistent with the patient's left upper extremity radicular complaints."  (R. 216.)

Though Plaintiff was regularly treated for degenerative disc

disease of her cervical spine (*see*, *e.g.*, R. 217, 263, 399, 403),
complaints of shoulder pain do not become a regular issue until
December of 2011.  On December 5, 2011, Dr. Vergari noted that
Plaintiff's "neck pain radiates to her left arm and shoulder with
left hand paresthesias.  Patient complains of stiff neck and at
times is not able to move her left hand."  (R. 381.)  Examination
of the left shoulder showed "tenderness at supraspinatus insertion.
ROM: abduction limited to 75 degrees.  Tests: negative Hawkin's
test, negative Neer Impingement sign."  (R. 382.)  He assessed
Plaintiff to have "[u]nspecified disorders of bursae and tendons in
shoulder region."  (R. 383.)

The shoulder problem was noted, and examinations and
assessments were similar at Plaintiff's office visits on January
24, 2012 (R. 378-79), March 27, 2012 (R. 371-72), May 25, 2012
(368-69), and September 4, 2012 (R. 365-66).  Plaintiff had an
injection in her shoulder on March 14, 2012 (R. 374), and
experienced some pain relief (R. 368, 371).  At the time of the
procedure, it was noted that Plaintiff's pain decreased from eight
out of ten to four out of ten.  (R. 374.)

Similarly, Plaintiff's knee problem is documented in the
record, as well as treatment for it and limitations which may be
associated.  (*See* R. 263, 365-66, 368-69, 371-72, 378-79, 381-83,
The knee problem complained of is supported by diagnostic testing.
(R. 394, 395.)  Plaintiff received an injection in her right knee

28

on February 1, 2012, which reduced her pain level from ten out of ten to six out of ten.  (R. 376.)   Though pain improved in her right knee, Plaintiff continued to have pain in her left knee and difficulty walking up and down stairs, limitation of movement, and severe crepitation.  (R. 365, 368.)   Plaintiff had a left knee injection on September 17, 2012, with a reduction in pain noted from 10 out of 10 to 6 out of 10.  (R. 361.)

Plaintiff's carpal tunnel syndrome is also documented as shown by diagnostic testing completed on November 22, 2011.  (R. 399.) Thereafter, it was continually noted by Dr. Vergari upon examination and in his assessment.  (See R. 366, 369, 372, 379, 382-83.)

All of these problems were reflected in the diagnoses listed on the October 5, 2012, Physical Residual Functional Capacity form completed by Dr. Vergari.  (R. 407-12.)   Plaintiff also testified that she had shoulder and knee problems for which she received treatment.  (R. 63.)   She also testified that these problems caused pain and that she got relief from the injections and medication. (*Id.*)

We have had occasion to consider the issue of an ALJ's alleged failure to adequately consider and/or discuss alleged medical/mental health issues in two recent decisions, *Martin v. Coleman*, Civ. A. No. 3:14-CV-1730, 2015 WL 1499874, at *13 (M.D. Pa. Apr. 10, 2015), and *Keys v. Colvin*, Civ. A. No. 3:14-CV-191,

2015 WL 1275367, at *11 (M.D. Pa. Mar. 19, 2015).  Because the
Acting Secretary's decision can only be deemed to be based on
substantial evidence where the ALJ's analysis is sufficiently
thorough, *see*, *e.g.*, *Dobrowolsky*, 606 F.2d at 406, an ALJ's failure
to discuss medical problems documented and discussed by a
plaintiff's treating physician falls short of the evidentiary
standard, *see Martin*, 2015 WL 1499874, at *13.

Defendant points to evidence allegedly supporting the ALJ's
determination (Doc. 18 at 13-17), but we cannot conclude this
evidence provides the support suggested or satisfies the ALJ's
obligation.  First, we cannot say that the ALJ fulfilled his duty,
not only to state the evidence considered which supports the
result, but also to indicate what evidence he rejected as he did
not explain the rejection of probative evidence related to
Plaintiff's alleged shoulder and knee impairments, as well as her
carpal tunnel syndrome.  *See Cotter*, 642 F.2d at 706-07.  While we
have found that an alleged step two error may be harmless, *Keys*,
2015 WL 1275367, at *11, the situation here is analogous to *Martin*
where we found that remand was required.  In *Keys* and the cases
relied upon therein,[5] the ALJ considered the symptoms and

_____

[5]  *Salles v. Commissioner of Social Security*, 229 F. App'x
140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford
v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)); *Garcia v.
Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir.
2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007));
*Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at
*13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-

functional limitations associated with the non-severe impairment in his RFC analysis.  *Id.*  Because ALJ Zack did not acknowledge or discuss numerous diagnoses (*see* R. 407), we have no basis to conclude that he took into account allegedly associated symptoms and functional limitations.  As set out in our review of the evidence above, the record shows that both Plaintiff and Dr. Vergari noted pain and other symptoms associated with shoulder and knee conditions––conditions verified by objective diagnostic testing.  Furthermore, the chronology of when Plaintiff's knee and shoulder problems and carpal tunnel syndrome developed as consistent problems undermines the ALJ's reliance on the opinions of Doctors Hutz and Mazza over that of Dr. Vergari: Dr. Vergari is the only physician who regularly treated Plaintiff after these conditions were diagnosed.  The relationship of these problems to consideration of Plaintiff's credibility also supports the need for a thorough analysis of all impairments supported by the record.

Second, the rationale now provided by Defendant in support of the ALJ on this issue is neither substantively sufficient nor procedurally appropriate.  It is substantively deficient because it does not address the problems previously noted.  It is procedurally inappropriate because, as Plaintiff notes, Defendant now "proffers a series of post hoc rationalizations in violation of the *Chenery* doctrine."  (Doc. 19 at 2 (citing *SEC v. Chenery Corp.*,

657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

31

318 U.S. 80 (1943) (hoding "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses tht its action was based."). We agree that Defendant cannot do at this stage of the proceedings what the ALJ should have done. It is the ALJ's responsibility to explicitly provide reasons for his decision and the analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07.

For these reasons we conclude the ALJ's error affected his RFC analysis and cannot be deemed harmless. Thus, this matter must be remanded to the Acting Commissioner for further consideration. Upon remand, all evidence relating to Plaintiff's diagnosed conditions must be evaluated pursuant to relevant regulations, caselaw, and social security rulings.

Having determined that remand is required, we need not discuss Plaintiff's remaining arguments regarding whether substantial evidence supports the ALJ's RFC assessment. However, we note that an ALJ's specific rather than general citation to a lengthy exhibit of record in support of his RFC determination is important for the reviewing court to determine if his decision is based on substantial evidence--while every tidbit of evidence and every factor set out in rulings and regulations need not be specifically discussed, substantial evidence cannot be established with conclusory statements and broad reference to the record.

## 2. __Plaintiff's Use of Assistive Device__

Plaintiff avers that the ALJ's RFC assessment is not supported by substantial evidence given the uncontroverted evidence that she uses a cane. (Doc. 15 at 16.)  Specifically, she argues that: 1) the ALJ did not consider the impact of the need for an assistive device on her ability to perform sedentary work; and 2) he did not pose a hypothetical question which included the use of a cane. (Doc. 15 at 16-17.)

Because we have determined remand is required as discussed above and that remand will encompass a reevaluation of Dr. Vergari's finding that Plaintiff needed to use a cane at times (R. 410), Plaintiff's use of a cane will be addressed upon remand. Therefore, further discussion of this issue is not required at this time.

## 3. __Step Five Finding__

Plaintiff maintains the Acting Commissioner did not sustain her burden of establishing that there is other work in the national economy Plaintiff could perform. (Doc. 15 at 18.)  Defendant responds that the ALJ properly relied on the VE's testimony: even if there was some erosion in the numbers of the jobs identified because of varied levels of exertion, the ALJ was entitled to rely on the VE's testimony that sufficient numbers of jobs exist which Plaintiff could perform.  (Doc. 18 at 23-26.)

Because remand is otherwise required for reconsideration of

earlier steps in the sequential process, further proceedings may well lead to a determination that Plaintiff has limitations which were not previously credited and/or considered.  Therefore, additional VE testimony may be called for and a decision on this issue is not required at this time.

### V. Conclusion

For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: April 21, 2015

34